UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

══════════════════════════

BILLIE R. BANKS,

                         Plaintiff,

        v.                                                    **DECISION AND ORDER**

                                                                  14-CV-970S

GENERAL MOTORS, LLC,

                         Defendant.

══════════════════════════

## I.      Introduction

This is an employment discrimination action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq.; 42 U.S.C. § 1981; and the New York State Human Rights Law, N.Y. Exec. L. §§ 290, et seq.  Plaintiff, an African American female, contends that Defendant General Motors discriminated against her on the basis of her race and sex, creating and permitting a hostile work environment.  She also alleges that Defendant retaliated against her for complaining about her working conditions.

Presently before this Court is Defendant's Motion for Summary Judgment (Docket No. 76)[1].  Defendant contends that much of Plaintiff's claims are time barred and that she failed to state a prima facie case of race or gender discrimination or establish retaliation against her under any of the legal standard she claims.  For the reasons stated herein,

_____

[1]In support of its motion, Defendant submits its Statement of Undisputed Facts; the Declaration of its Attorney with exhibits; its Memorandum of Law, Docket No. 76; and Defendant replied with its Statement of Allegedly Undisputed Material Facts, ("Def. Reply to Pl. Counterstatement"); attorney's reply Declaration with exhibits, and Reply Memorandum of Law, Docket No. 89.

Plaintiff filed her responding papers, including her Counterstatement of Contested Material Facts, Docket No. 82 ("Pl. Counterstatement") with exhibits, Docket Nos. 82, 83, and her opposing Memorandum of Law, Docket No. 83.

Defendant's Motion for Summary Judgment (Docket No. 76) is **granted in part, denied in part**.  The motion is denied as to aspects of Plaintiff's retaliation claim but is granted for the balance of her claims.

## II.    Background

### A.  Facts

Plaintiff was employed by Defendant starting in 1996, when it owned the assembly plant in Lockport, New York (Docket No. 76, Def. Statement ¶¶ 1, 2).  Defendant later promoted Plaintiff as a safety supervisor at that plant (id. ¶ 3).  From 1999 to 2009 Defendant General Motors did not operate the Lockport plant (Docket No. 89, Def. Reply to Pl Counterstatement to ¶¶ 2, 3; see also Docket No. 76, Def. Statement ¶ 3); Delphi Automotive purchased the Lockport plant from Defendant in 1999, and owned it until September 2009 when General Motors reacquired it (Docket No. 76, Def. Statement ¶¶ 6-7).

One of Defendant's arguments is that many of Plaintiff's incidents are time barred for a Title VII claim (Docket No. 76, Def. Memo. at 4) as well as for claims under other antidiscrimination statutes (id. at 4-5).  Plaintiff discusses incidents from 2004 (including events that occurred when the Lockport plant was owned by a different entity) until she filed her EEOC Charge in October 24, 2013 (Docket No. 83, Pl Counterstatement ¶ 8; id., Pl. Memo. at 3; Docket No. 82, Pl. Ex. 14, Dep. Ex. 160, at P193, Dep. Ex. 309, at P185, P189), and beyond.

As discussed below, Plaintiff only can rely upon events from 300 days before filing her EEOC Charge to be timely for her Title VII claim, 42 U.S.C. § 2000e-5(e)(1).  Using

October 24, 2013, the date she filed her New York State Division of Human Rights Charge (as discussed below) as a dividing point, the factual allegations described herein will be divided between events before and after that date.

Another division of the facts are incidents that Plaintiff directly was involved in and those incidents involving other African American or female General Motors employees that Plaintiff learned of that she alleges are part of the hostile work environment. She alleges offensive conduct directed at other employees that she became aware of but did not personally witness (Docket No. 76, Def. Statement ¶¶ 88, 90, 92-96).

In support of its motion for summary judgment, Defendant submitted a Statement of Facts it believes not to be in dispute (Docket No. 76). Plaintiff disputes facts as asserted by Defendant and adds additional details not stated in Defendant's Statement (see generally Docket No. 82, Pl. Counterstatement). Sometimes she supports these details with references to documents and testimony in the motion papers while other times she provides no record references (id.). Defendant then submitted a Reply to Plaintiff's Counterstatement (Docket No. 89), disputing some of the details asserted in her Counterstatement.

This Court generally will reference the Defense Statement of Facts and note only when pertinent where Plaintiff raises a material dispute but not necessarily the particular details that she disputes.

1.  Events to October 24, 2013, Involving Plaintiff

From October 2002 until Plaintiff filed her charges in October 2013 (and thereafter), she alleges that she was subjected to different terms and conditions of

3

employment than Caucasian male employees (Docket No. 1, Compl. ¶¶ 43-48; Docket No. 82, Pl. Ex. 14, Amended EEOC Charge at P194, hereinafter "Amended EEOC Charge"). During this period, she claims being subject to unwanted comments, tirades, and disparaging treatment believed to be due to her race and/or gender (Docket No. 82, Amended EEOC Charge at P194). She also claims working in a sexually and racially hostile work environment, while Defendant, aware of these conditions, refused to investigate, stop or prevent this behavior (Docket No. 1, Compl. ¶¶ 25-27). For example, she claimed that her directives as a safety supervisor went unheeded by Caucasian male employees while those from white counterparts were followed (Docket No. 82, Am. EEOC Charge at P195).

Plaintiff alleges that she was erroneously found not to be disabled when she took medical leave in 2002, leading to her termination and then reinstatement (Docket No. 82, Pl. Counterstatement ¶ 10, at 7-9). In January 2004, a Caucasian employee called Plaintiff a "dumb nigger" (hereinafter referenced "n____") (Docket No. 76, Def. Statement ¶ 10). She alleges that she was berated for withholding air sampling data from the United Auto Workers union (Docket No. 76, Def. Statement ¶¶ 21-25). She claims she was denied support staff (Docket No. 1, Compl. ¶ 57); later she received an assistant, Jared Richardson, who then made negative comments about her performance and mocked her during her presentations (Docket No. 76, Def. Statement ¶¶ 13-19; see Docket No. 82, P. Counterstatement ¶¶ 13-19). She complained that she had to do the work of a white male employee, performing his ergonomics duties (Docket No. 76, Def. Statement ¶¶ 40-42).

4

Plaintiff then took a series of sick leaves (in May 2010, from September 2013 to May 2014, and January 2016) allegedly due to her stress, panic, disorder, depression, and anxiety created by the hostile work environment (Docket No. 1, Compl. ¶¶ 88, 91, 95; Docket No. 76, Def. Statement ¶¶ 108-09; Docket No. 82, Pl. Counterstatement ¶ 109; see Docket No. 89, Def. Reply to Pl. Counterstatement ¶ 108).

        2.  Incidents Involving other General Motors Employees Prior to October 2013

Plaintiff also alleges incidents involving other African American or female General Motors employees who experienced racial or sex discrimination or harassment. Many of these incidents, however, Plaintiff never experienced or saw for herself. One incident involves an African American employee seeing a noose hung at the plant (Docket No. 76, Def. Statement ¶ 88; Docket No. 82, Pl. Counterstatement ¶ 89) and later hearing the epithet "n_____" said to him on the production floor and written in the bathroom (Docket No. 82, Pl. Counterstatement ¶ 88, at 73-74). Another employee complained to Plaintiff that he was called "n____" everyday in the workplace (Docket No. 76, Def. Statement ¶ 92; Docket No. 82, Pl. Counterstatement ¶ 92). Another African American employee was referred to as a "silverback" by a manager (Docket No. 76, Def. Statement ¶ 90; see Docket No. 82, Pl. Counterstatement ¶¶ 88, 90) while another Black employee was present for the playing of "Rapper's Delight" (Docket No. 76, Def. Statement ¶ 94; see Docket No. 82, Pl. Counterstatement ¶ 94). Another African American employee saw the Confederate flag flown on the Lockport plant (Docket No. 76, Def. Statement ¶ 95; Docket No. 82, Pl. Counterstatement ¶ 95).

3.  Post-EEOC Charge Incidents Directly Involving Plaintiff

After filing her EEOC Charge, Plaintiff alleges she continued to be subject to a hostile environment, discrimination, and retaliation against her by her supervisors and co-workers (Docket No. 1, Compl. ¶¶ 61, 74, 110).

From January 2012 through August 2013, a white male safety trainer, George Miller, refused on multiple occasions to provide Plaintiff with data necessary for her job but would furnish that information to her white male colleagues (Docket No. 76, Def. Statement ¶ 32; see Docket No. 82, Pl. Counterstatement ¶ 32).  Two employees reported to Plaintiff that Miller also referred to her as an "idiot" during training sessions and that he said she did not know what she was doing (Docket No. 76, Def. Statement ¶¶ 33-34).

She accused a male Caucasian maintenance supervisor of undermining her before her union counterparts (Docket No. 82, Pl. Counterstatement ¶ 44; see Docket No. 76, Def. Statement ¶ 44).  On August 23, 2013, a subcontractor to Defendant violated Defendant's safety protocols and Plaintiff wanted that subcontractor removed from the plant.  That same maintenance supervisor responded by denouncing Plaintiff in a tirade which sufficiently intimidated her to rescind the expulsion order of the subcontractor. (Docket No. 76, Def. Statement ¶ 45; see Docket No. 82, Pl. Counterstatement ¶ 45).

While on medical leave in September 2013, Plaintiff learned that her job was being posted (Docket No. 82, Pl. Counterstatement ¶ 49, at 34-35; see Docket No. 76, Def. Statement ¶¶ 53, 108-09).  Meanwhile, Defendant hired Caucasian male Bob Duke in April 2014 in Plaintiff's safety supervisor position; she claims that this hiring was in retaliation for her discrimination complaints (Docket No. 76, Def. Statement ¶¶ 53-54).

6

Plaintiff claimed Duke was given less responsibilities and furnished with more support staff than she was when she worked as a safety supervisor (Docket No. 76, Def. Statement ¶ 55).

On April 24, 2014, she advised Defendant that she could return to work as of May 5, 2014 (Docket No. 82, Pl. Counterstatement ¶ 49, at 36). She then was offered a different position with less responsibility and on the second shift (Docket No. 76, Def. Statement ¶¶ 59-61). When she attempted to return to work, Defendant's psychiatrist, Dr. Don Jones, refused to clear her (Docket No. 76, Def. Statement ¶ 101; Docket No. 82, Pl. Counterstatement ¶ 49, at 36-38). Plaintiff contends that this process was unusual. When she returned from medical leave for stress in 2010, Defendant did not require Plaintiff obtain clearance from a General Motors psychiatrist to return (id. at 38). She claims this occurred in retaliation presumably for her prior complaints. Dr. Jones later approved her return in September 2014 and Plaintiff resumed work in October (Docket No. 76, Def. Statement ¶¶ 103, 58).

In April 2015, Miller used Plaintiff as an example during a CPR training, stating that Plaintiff was suffering from a hypothetical drug overdose (Docket No. 76, Def. Statement ¶ 37). Later that month, another employee told Plaintiff that Miller removed her name from training materials she had assembled (id. ¶ 38).

Plaintiff also conducted annual inspections and saw racist and sexist graffiti in the men's room in multiple buildings in the plant. Janitorial staff then attempted to remove it. (Docket No. 76, Def. Statement. ¶¶ 79, 97; Docket No. 82, Pl. Counterstatement ¶¶ 79, 97.) Plaintiff also saw pin-up calendars in maintenance shop, electrical shop, tool rooms

7

in the plant and she removed the calendars and threw them out (Docket No. 76, Def. Statement ¶ 80).  She also saw silhouettes of nude women on employees' vehicles and lockers (id. ¶ 81) and Confederate battle flags on employees' vehicles, t-shirts, and a baseball cap (id. ¶ 82).  Defendant replies that these incidents of graffiti were sporadic and Defendant "took action to remove such items when they were brought to management's attention" (Docket No. 89, Def. Reply to Pl. Counterstatement to ¶¶ 79-82).

In April 2015, a white manager walked past a room where Plaintiff and another African American employee were meeting with a white colleague, the white manager stated that he needed to come in to "even it out."  The manager later stated that he meant evening the number of union and management persons in that meeting, but Plaintiff construed the racial composition of those present.  (Docket No. 76, Def. Statement ¶ 83; see Docket No. 89, Def Reply to Pl. Counterstatement ¶ 83.)

Plaintiff adds that on April 2015 a female white employee once referred to Plaintiff as "Chiquita," which Plaintiff deemed discriminatory, derogatory, and demeaning (Docket No. 82, Ex. 1, Pl. Decl. ¶ 92; Docket No. 82, Pl. Counterstatement ¶ 25).  Defendant counters that Plaintiff deemed the term "Chiquita" to be derogatory but, in Spanish, the word is a term of endearment (Docket No. 89, Def. Reply to Pl. Counterstatement ¶¶ 21-26).  Plaintiff, however, is not Hispanic.

Plaintiff alleges that a UAW representative failed to release equipment to her on three or four occasions, falsely claiming that the equipment was broken (Docket No. 76, Def. Statement ¶ 26).

Plaintiff cites instances of inappropriate sexual comments during her tenure.  She, however, did not report these incidents at the time.   A member of Defendant's management made sexist comments to Plaintiff about her body shape and told her that they should go out to dinner (id. ¶ 84; see Docket No. 82, Pl. Counterstatement ¶ 84). Plaintiff concedes that she did not report this conduct but states that it was going on for years since 2009 (Docket No. 82, Pl. Counterstatement ¶ 84).

She accused another manager of also making sexist comments toward her, calling her beautiful (Docket No. 76, Def. Statement ¶ 85; see Docket No. 82, Pl. Counterstatement ¶ 85).  A third manager followed Plaintiff on his scooter, stared at her rear end and said, "looking good back there" (Docket No. 76, Def. Statement ¶ 86; Docket No. 82, Pl. Counterstatement ¶ 86).  One time, Plaintiff entered a room with three male employees as they engaged in a conversation about penises (Docket No. 76, Def. Statement; Docket No. 82, Pl. Counterstatement ¶ 87; Docket No. 82, Pl. Counterstatement ¶ 87).

### 4. Post-Filing Incidents Involving Other African American or Female Employees

Plaintiff claimed that a female African American employee was discriminated against by a white supervisor who told only her that she faced discipline if she continued to watch Game 7 of 2015 National Basketball Association Finals at a workstation with other coworkers (Docket No. 76, Def. Statement ¶ 96; Docket No. 82, Pl. Counterstatement ¶ 96).

Plaintiff gives other examples of discriminatory acts by George Miller, such as his calling a Native American co-worker "Pocahontas" or by her native name of "Snow Foot,"

and Plaintiff complained to UAW shop chairman, Todd McNall, about Miller's disrespect (Docket No. 82, Pl. Counterstatement ¶¶ 21, 26).

### 5.  Retaliation Against Plaintiff

As previously noted, Plaintiff went on medical leave in September 2013 (Docket No. 76, Def. Statement ¶ 108) allegedly due to the stress and fatigue from her work conditions (Docket No. 82, Pl. Counterstatement ¶ 109).  On November 22, 2013 (after filing the initial EEOC Charge), her salary on medical leave was terminated (id. ¶ 49, at 34; see Docket No. 76, Def. Statement ¶ 100).  She alleges that this termination was in retaliation for her complaints (Docket No. 83, Pl. Memo. at 24).

Plaintiff claims that every complaint she made resulted in retaliation against her (Docket No. 76, Def. Statement ¶¶ 98, 99 & n.2).  Specific instances of retaliation include cutting her sick leave benefits in November 2013 (id. ¶ 100); Defendant's doctors declining to allow her to return to work from that medical leave in April 2014, with Dr. Jones asking her questions about her pending EEOC Charge (id. ¶ 101).  Dr. Jones clears employees with mental health issues, while other plant doctors (such as Dr. Jerome Ulatowski) are not able to independently return an employee from medical leave on that basis (id. ¶ 102).  Dr. Jones eventually approved Plaintiff's return to work in late September 2014 (id. ¶ 103).

Plaintiff next claims that she was denied permission to attend an industrial hygiene training session because Defendant deemed that subject was beyond the scope of global safety that was within the scope of Plaintiff's responsibilities (id. ¶ 106).  She also alleges

exclusion from a one-on-one meeting for safety supervisors attended by Duke (id. ¶ 107), presumably when Duke was the safety supervisor.

### B.  Procedural History

On October 24, 2013, Plaintiff filed her Charge of Discrimination with the New York State Division of Human Rights and the United States Equal Employment Opportunity Commission ("EEOC") (Docket No. 82, Pl. Ex. 14, Dep. Ex. 160 at P193), and then filed her charge with the EEOC on December 9, 2013 (id., Dep. Ex. 309, at P185; see Docket No. 1, Compl. ¶¶ 94, 114a).  Plaintiff amended her Charge on July 10, 2014 (Docket No. 83, Pl. Counterstatement ¶ 8; id., Pl. Memo. at 3; Docket No. 82, Pl. Ex. 14, at P189; see Docket No. 1, Compl. ¶ 114c).  The EEOC then issued Plaintiff her Right to Sue Letter on August 19, 2014 (Docket No. 1, Compl. ¶ 114e; Docket No. 76, Def. Memo. at 4; Docket No. 83, Pl. Memo. at 3).

Plaintiff filed her Complaint on November 14, 2014 (Docket No. 1, Compl.; but cf. Docket No. 76, Def. Statement ¶ 9 (stating that Complaint was filed on November 11, 2014)).  In the First Cause of Action, Plaintiff charges Defendant with sex discrimination and creating a hostile work environment in violation of Title VII (Docket No. 1, Compl. ¶¶ 116-25, 122).  The Second Cause of Action alleges a parallel sex discrimination and hostile work environment claim under the New York State Human Rights Law (id. ¶¶ 127-33).

The Third Cause of Action alleges Plaintiff suffered from a hostile work environment due to her sex in violation of Title VII (id. ¶¶ 135-42).  The Fourth Cause of Action alleges the same claims under the New York Human Rights Law (id. ¶¶ 144-49).

The Fifth Cause of Action alleges Plaintiff suffered from racial discrimination and a hostile work environment due to her race (id. ¶¶ 151-60).  The Sixth Cause of Action alleges the parallel claims under the New York Human Rights Law (id. ¶¶ 162-68).

The Seventh Cause of Action alleges Plaintiff endured a racially hostile work environment from her coworkers that Defendant's management failed to redress, in violation of Title VII (id. ¶¶ 170-77).  The Eighth Cause of Action alleges parallel racially hostile work environment in violation of New York Human Rights Law (id. ¶¶ 179-84).

The Ninth Cause of Action alleges that Plaintiff was treated adversely because of her complaining about Defendant's unlawful discriminatory practices and Defendant retaliated against her in violation of Title VII (id. ¶¶ 186-91), while the Tenth Cause of Action alleges retaliation for the same complaints in violation of the New York Human Rights Law (id. ¶¶ 193-99).

Finally, the Eleventh Cause of Action alleges race discrimination in her employment contract in violation of 42 U.S.C. § 1981 (id. ¶¶ 201-07).

Defendant answered (Docket No. 14).  After issuance and amendment of the Scheduling Order (Docket Nos. 25, 42, 47, 59, 63, 68, 69, 72, 75) and discovery (see, e.g., Docket No. 65, Pl. Motion to Compel; Docket No. 72, Order deciding Motion to Compel), Defendant filed its present Motion for Summary Judgment (Docket No. 76). Initially, responses to this motion were due on March 13, 2018 (Docket No. 77), but this was extended (see Docket No. 80, Motion) to March 20, 2018, and replies by April 3, 2018 (Docket No. 81), and the reply deadline was extended (Docket No. 85, Motion) to

April 17, 2018 (Docket No. 88).  After timely submission of responding and reply papers, this Court deemed the motion submitted without oral argument.

### III.   Discussion

A.  Applicable Standards

1.  Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  A fact is "material" only if it "might affect the outcome of the suit under governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A "genuine" dispute, in turn, exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party," id.  In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion," Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (internal quotations and citations omitted).

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper," Bryant v. Maffucci, 923 F.32d 979, 982 (2d Cir. 1991) (citation omitted).  Indeed "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper," Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82, 83 (2d Cir. 2004) (citation omitted).  The

function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial," Anderson, supra, 477 U.S. at 249.

"When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," Cordiano v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009), citing, Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  "Where the moving party demonstrates 'the absence of a genuine issue of material fact,' the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact," Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (citation omitted) (quoting Celotex, supra, 477 U.S. at 323).  The party against whom summary judgment is sought, however, "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original removed).

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003); Fed. R. Civ. P. 56(a).  The party seeking summary judgment has the burden to demonstrate that no

genuine issue of material fact exists.  In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the nonmovant.  Ford, supra, 316 F.3d at 354.

2.   Title VII

Plaintiff establishes discrimination either by direct evidence, Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985); Teamsters v. United States, 431 U.S. 324, 358 n.44, 97 S.Ct. 1843, 52 L.Ed.2d 396 (Docket No. 83, Pl. Memo. at 17), or by the burden shifting analysis from McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  For direct evidence of discrimination, Plaintiff must meet her "initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act," Teamsters, supra, 431 U.S. at 358.

Under McDonnell Douglas, Plaintiff bears the burden of demonstrating that race (or sex, Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)) was a motivating factor in her adverse employment action, McDonnell Douglas, supra, 411 U.S. at 802-04.  She then must prove an inference of discrimination where direct evidence is lacking leading to an application of the burden of proof shifting standard of McDonnell Douglas.  Under that standard, Plaintiff bears the burden of establishing a prima facie case of discrimination, Burdine, supra, 450 U.S. at 252-54; McDonnell Douglas, supra, 411 U.S. at 802.  She must prove the prima facie case by a preponderance of the evidence, Burdine, supra, 450 U.S. at 252-53.  "The burden of establishing a prima facie case of disparate treatment is not onerous," id. at

15

253, basically that Plaintiff applied for a position or is employed in a job she was qualified for but was rejected or otherwise hindered under circumstances that give rise to an inference of unlawful discrimination, id.  The prima facie case creates a presumption of unlawful discrimination by the Defendant employer, id.

If Plaintiff meets this initial burden, the burden shifts to Defendant to articulate some legitimate, nondiscriminatory reason for its action, id. at 254-56.  If that has been met, the burden shifts back to Plaintiff to show, beyond the prima facie case, that Defendant's determination was the result of discrimination, id. at 256; see McDonnell Douglas, supra, 411 U.S. at 804-05.  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff," Burdine, supra, 450 U.S. at 253.  As noted by the Burdine Court, the McDonnell Douglas evidentiary burden shifting "serves to bring the litigants and the court expeditiously and fairly to this ultimate question," id., or as later held in the TWA case, "that the 'plaintiff [has] his [or her] day in court despite the unavailability of direct evidence,'" TWA, supra, 469 U.S. at 121 (quoting Loeb v. Textron, Inc., 600 F.2d 1003, 1014 (1st Cir. 1979)) (alterations added).

### a.  Hostile Work Environment

Hostile work environment claims under Title VII, § 1981, and the New York State Human Rights Law[2] have the same elements.  Plaintiff needs to prove that the "workplace is permeated with 'discriminatory intimidation, ridicule and insult,'" that is so "severe or pervasive" to create an "objectively hostile or abusive work environment," and plaintiff

---

[2]See Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 310, 786 N.Y.S.2d 382, 394 (2004).

16

"subjectively perceive[d] the environment to be abusive," <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21-22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting <u>Meritor Sav. Bank v. Vinson</u>, 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).  Thus, Plaintiff must "not only allege that she found the environment offensive, but that a reasonable person also would have found the environment to be hostile or abusive," <u>Bentivegna v. People's United Bank</u>, No. 2:14-cv-599, 2017 WL 3394601, at *13 (E.D.N.Y. Aug. 7, 2017), citing <u>Harris</u>, <u>supra</u>, 510 U.S. at 21-22.

This proof must be based upon the totality of the circumstances, <u>Bentivegna</u>, <u>supra</u>, 2017 WL 3394601, at *13.  Plaintiff has to show that the misconduct was so severe or pervasive that the complained-of behavior was sufficiently frequent, or severe; was physically threatening or humiliating or merely an offensive comment; unreasonably interfered with the victim's work; and caused psychological harm, <u>see Harris</u>, <u>supra</u>, 510 U.S. at 23. "[O]ffhand comments, and isolated incidents (unless extremely serious)" will not suffice, <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); <u>see Petrosino v. Bell Atl.</u>, 385 F.3d 210, 223 (2d Cir. 2004).  The <u>Meritor Savings</u>-<u>Harris</u> standard "takes the middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury," <u>Harris</u>, <u>supra</u>, 510 U.S. at 21.  The mere utterance of an epithet is not sufficient to "affect the conditions of employment to implicate Title VII," <u>id.</u> (quoting <u>Meritor Sav.</u>, <u>supra</u>, 477 U.S. at 67).

### b.  Disparate Treatment Claims

To allege a disparate treatment claim because of race or gender under either Title VII or the New York State Human Rights Law, Plaintiff again needs to state a prima facie case.  If this is done, the burden shifts to Defendant to show non-discriminatory reason for the action.  If Defendant presents a non-discriminatory reason, the burden shifts back to Plaintiff to establish that Defendant's reason was pretextual.  See, e.g., McDonnell Douglas, supra, 411 U.S. at 802-04.

The prima facie case here is that Plaintiff is a member of a protected class; she is qualified for her position; she suffered from an adverse employment action; and the circumstances give rise to an inference of discrimination, see Moll v. Telesector Resources Group, Inc., 04CV805, 2012 U.S. Dist. LEXIS 74949, at *47-48 (W.D.N.Y. May 30, 2012) (Skretny, C.J.), rev'd on other grounds, 760 F.3d 198 (2d Cir. 2014).

### c.  Retaliation

Retaliation for asserting employment discrimination claims is also governed by the McDonnell Douglas burden shifting standards, Richardson v. New York Dep't of Correctional Servs., 180 F.3d 426, 443 (2d Cir. 1999).  Here, Plaintiff needs to show that she participated in a protected activity, that Defendant knew of the activity; that an employment decision or action disadvantaged Plaintiff; and there was a causal connection between the protected activity and the negative decision, id.; Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002); see Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 67-70, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).  "To establish a causal connection, a plaintiff must demonstrate that an adverse employment action 'occurred in

18

circumstances from which a reasonable jury could infer retaliatory intent,'" Hudson v. Greyhound Lines, Inc., No. 04CV1026, 2008 WL 819687, at *10 (W.D.N.Y. Mar. 25, 2008) (Skretny, J.) (quoting Parrish v. Sollecito, 256 F. Supp. 2d 264, 268 (S.D.N.Y. 2003)). Often this is proven indirectly by the close temporal relationship between the protected activity and the discriminatory treatment, Hudson, supra, 2008 WL 819687, at *10 (citing cases).

If that burden is met, Defendant then has the burden to establish it had a nondiscriminatory reason for the decision and, if Defendant does so, the burden shifts back to Plaintiff to establish that defendant's reason is pretextual for impermissible retaliation, Richardson, supra, 180 F.3d at 443.

### 3.   42 U.S.C. § 1981

As noted by Plaintiff (see Docket No. 83, Pl. Memo. at 16), § 1981 precludes discrimination based upon race, see Littlejohn v. City of N.Y., 795 F.3d 297, 313 (2d Cir. 2005).  That section provides that

> "all persons within the jurisdiction of the United States have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other,"

42 U.S.C. § 1981.  This includes employment contracts.  The act was amended in 1991 to define "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," id., § 1981(b).

To state a claim for employment discrimination under this section, Plaintiff has to allege that she belongs to a racial minority, that she applied for a job, Yoonessi v. State Univ. of N.Y., 862 F. Supp. 1005, 1019 (W.D.N.Y. 1994) (Heckman, Mag. J., adopted by Arcara, J.), leave to appeal denied, 56 F.3d 10 (2d Cir. 1995) (per curiam), cert. denied, 516 U.S. 1075, 116 S.Ct. 779, 133 L.Ed.2d 730 (1996), or was employed (these elements undisputed here), but despite her qualifications was subjected to some form of adverse treatment (such as denial of promotion or termination), and that treatment occurred under circumstances that gave rise to an inference of discrimination, Hunter v. Citibank, N.A., 862 F. Supp. 902, 906 (E.D.N.Y. 1994), aff'd, 60 F.3d 810 (2d Cir.) (summary Order), cert. denied, 516 U.S. 978, 116 S.Ct. 483, 133 L.Ed.2d 410 (1995); see Yoonessi, supra, 862 F. Supp. at 1019.  Proof of this discrimination can be by the same burden shifting adopted in McDonnell Douglas.

4.   New York State Human Rights Law and Supplemental Jurisdiction

New York State Human Rights Law also has the same burden of proof and burden shifting from McDonnell Douglas stated above for Title VII claims (see Docket No. 76, Def. Memo. at 6; Docket No. 83, Pl. Memo. at 16-17), Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000); Forrest, supra, 3 N.Y.3d at 310, 786 N.Y.S.2d at 394.

Subject matter jurisdiction may be raised by the parties or by this Court sua sponte, Lyndonville Sav. Bank & Trust v. Lussier, 211 F.3d 697, 700-01 (2d Cir. 2000); LaChapelle v. Torres, 37 F. Supp. 3d 672, 680 (S.D.N.Y. 2014).  Plaintiff's New York State Human Rights Law claims share the same nucleus of operative facts for her Title VII and § 1981 claims that this Court can exercise supplemental jurisdiction under 28 U.S.C.

20

§ 1367 over Plaintiff's state law claims, see Klein v. London Star Ltd., 26 F. Supp. 2d 689, 692 (S.D.N.Y. 1998).

### 5.   Limitations Period and Continuing Violation Doctrine

These Title VII and related discrimination claims need to be alleged on time to be actionable.   Plaintiff must file charges with the state equal employment agency within 300 days of the alleged discriminatory acts, 42 U.S.C. § 2000e-5(e)(1); Flaherty v. Metromail Corp., 235 F.3d 133, 136 n.1 (2d Cir. 2000) (Docket No. 76, Def. Memo. at 4).

New York State Human Rights Law claims, however, do not have an administrative charge requirement but an ordinary statute of limitations under the CPLR of 3 years, N.Y. Civ. P. L. R. 214 (id.).  The New York State Court of Appeals has held that this limitations period is tolled during the pendency of a State Division of Human Rights charge, Penman v. Pan Am. World Airways, 69 N.Y.2d 989, 517 N.Y.S.2d 719 (1987); see Sloth v. Constellation Brands, Inc., 924 F. Supp. 2d 461, 475 (W.D.N.Y. 2013) (Telesca, J.).

Section 1981 claims also do not have an administrative charge requirement but a four-year statute of limitations, see Jones v. R.R. Donnelly & Sons Co., 541 U.S. 369, 382, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004) (id. at 5).

For continuing violation doctrine to reach otherwise time barred claims, this Court must determine, first, if any alleged incident was within the limitation period; and, second, whether the prior events are sufficiently related in nature and severity to the latter incidents that are within the period such that they are "part of the same alleged hostile work environment practice," McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 76-77 (2d Cir. 2010) (id. at 4).  Multiple incidents of discrimination (even of the same type not the

21

result of discriminatory policy or mechanism) are not a continuing violation, Cetina v. Longworth, 583 F. App'x 1, 3 (2d Cir. 2014) (summary Order) (quoting Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993)); see Hills v. Praxair, Inc., No. 11CV678, 2012 WL 1935207, at *11 (W.D.N.Y. May 29, 2012) (Skretny, C.J.) (Docket No. 89, Def. Reply Memo. at 4).

While this Circuit may disfavor the continuing violation doctrine (see Docket No. 76, Def. Memo. at 5, citing cases), see also National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 111-15, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)), the Supreme Court in Morgan recognized continuing violation theory for hostile work environment claims. Such hostile work environment claims often involve a series of separate acts, id. at 115-17, which the Morgan Court noted that "hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct," id. at 115.

    B.  Statutes of Limitations

       1.  Timeliness of Plaintiff's Claims

This Court first addresses the timeliness of Plaintiff's federal and state law claims. Defendant argues that some of Plaintiff's incidents predate the limitations periods for her Title VII, § 1981, and New York State Human Rights Law claims.  Defendant also contends that Plaintiff cannot argue continuing violations to have these earlier events covered by later, more timely events.  (Docket No. 76, Def. Memo. at 4-5, 5-6; see Docket No. 89, Def. Reply Memo. at 3-4.)

Plaintiff argues that incidents that predate limitation periods were continuing violations for incidents that were within the limitation periods (Docket No. 83, Pl. Memo.

at 3-4).   She contends that continuing violation doctrine applies to her hostile work environment claims under Title VII, § 1981, and New York State Human Rights Law (id. at 3, citing Fitzgerald v. Henderson, 251 F.3d 345, 363-64 (2d Cir. 2001); Morgan, supra, 536 U.S. at 115.   She further alleges that she and other African American employees were subject to racial epithets, threats, and otherwise deemed liars and thieves (id.).

### a.   Title VII Timeliness

For her Title VII claim, Plaintiff can only allege incidents from 300 days before the filing of her EEOC Charge, 42 U.S.C. § 2000e-5(e)(1).

The parties differ on the relevant accrual dates.   Defendant argues that the EEOC Charge was filed on December 9, 2013 (Docket No. 76, Def. Statement ¶ 8 (citing Docket No. 1, Compl. ¶ 94); id., Def. Memo. at 4), thus, Defendant concludes that any claims prior to February 12, 2013, are time barred (id., Def. Memo. at 4).   Plaintiff counters that she filed her EEOC Charge on October 24, 2013, then filed amended Charges on December 9, 2013, and again on July 10, 2014 (Docket No. 83, Pl Counterstatement ¶ 8; id., Pl. Memo. at 3; Docket No. 82, Pl. Ex. 14, Dep. Ex. 160, at P193, Dep. Ex. 309, at P185, P189).   Thus, Plaintiff concludes claims before December 28, 2012, would be time barred (Docket No. 83, Pl. Memo. at 3).

Under Title VII, Plaintiff needs to file a timely charge with either the EEOC or the state or local agency.   If filed with the state or local agency in a deferral jurisdiction such as New York, the charge shall be filed "within three hundred days after the alleged unlawful employment practice occurred," 42 U.S.C. § 2000e-5(e)(1); see Yoonessi, supra, 862 F. Supp. at 1013; see also Manual on Employment Discrimination and Civil Rights

Actions in the Federal Courts § 1:78 (2020) (in deferral state such as New York, the charge "cannot be filed with" the EEOC until filed with state or local agency, emphasis in original).

Drawing inferences in favor of Plaintiff as the non-movant here, see Matsushita Elec., supra, 475 U.S. at 587, this Court finds that the date of the filing of the original New York State Division of Human Rights Charge, of **October 24, 2013**, is the applicable date rather than either the filing date with the EEOC or the later dates of its amendments. Thus, as Plaintiff contends, the Title VII 300-day limitations period ran from **December 28, 2012, to October 24, 2013**.

### b.  42 U.S.C. § 1981

Plaintiff's § 1981 claims are timely if filed four years from when Plaintiff filed her Complaint.  The filing and entry of the Complaint occurred when it was dated, on **November 14, 2014** (Docket No. 1, Compl.).  The Summons was issued to Defendant on November 17, 2014 (Docket No. 2).  It is unclear how Defendant got the earlier date of November 11; that day is also a federal holiday, Veterans Day, see Fed. R. Civ. P. 6(a)(6)(A), so it is unlikely that it was filed that day (despite electronic filing).  Thus, the four-year statute of limitations period for Plaintiff's § 1981 claim ran from **November 14, 2010, to November 14, 2014** (despite both sides agreeing that the period ended on November 11, 2014, Docket No. 76, Def. Memo. at 5; Docket No. 83, Pl. Memo. at 3).

### c.  New York State Human Rights Law

Finally, the date of the Right to Sue Letter also is an important benchmark for establishing the toll of the New York State Human Rights Law claims pending resolution

of the State Human Rights or EEOC Charge.  Again, Defendant alleged that the Complaint was filed on November 11, 2014 (Docket No. 76, Def. Statement ¶ 9 (citing Docket No. 1, Compl.)).  Accepting that the Complaint was filed on **November 14, 2014** (Docket No. 83, Pl. Counterstatement ¶ 9; Docket No. 1), the New York State tolling for Plaintiff's New York State Human Rights Law claims ran from **October 24, 2013,** to August 19, 2014, when the Right to Sue Letter was issued, again as Plaintiff asserts.  As a result, Plaintiff's timely New York State Human Rights claims arise from **January 20, 2011**, and thereafter.

### d.  As Applied to Plaintiff's Claims

Despite this analysis, the precise dates of these deadlines are less relevant because many of Plaintiff's alleges claims occurred either well before or well within the limitation periods; there are no incidents alleged to have occurred at the cusp of proffered deadlines.  Five key events happened before all of the deadlines stated above:  Plaintiff's termination and restoration in 2002; in 2004, the use of the "n___" word by Warren Stoll; not receiving support staff from 2006-09; in 2010 disparaging remarks by Jared Richardson; and withholding of air sampling data in 2010.  The 2004 incident also occurred while Delphi ran the Lockport facility and not Defendant.  Absent a timely, relevant incident that is continuous of these prior incidents, these claims are time barred.  Defendant's motion for summary judgment (Docket No. 76) dismissing these untimely claims is granted.

Plaintiff performed annual safety inspections from 2010 to 2012 and resumed them in 2015 where she found examples of racist and sexist graffiti (Docket No. 82, Pl.

Counterstatement ¶ 79; Docket No. 76, Def. Statement ¶ 79).  The graffiti found during 2010-12 inspections is time barred but those found during the 2015 inspection are not.

Plaintiff also saw pin-up calendars in the maintenance and electrical shops and in the tool rooms in the plant during these inspections (Docket No. 76, Def. Statement ¶ 80; Docket No. 82, Pl. Counterstatement ¶ 80), but did not specify when she did.  One example presented in this record is a 2013 pin-up calendar (Docket No. 83, Pl. Ex. 43) that Plaintiff saw and later threw out only to have that calendar replaced with another pin-up (Docket No. 82, Pl. Counterstatement ¶ 80).  The posting of this 2013 calendar falls within the 300-day period for her Title VII charge; Defendant's motion for summary judgment dismissing this claim on its timeliness is also denied.

Plaintiff also alleges other incidents that occurred (such as specific comments made to Plaintiff) but without specifying a date when these incidents occurred or when Plaintiff observed them.  For example, she saw images of the silhouette of nude women on employee vehicles and lockers (id. ¶ 81; see Docket No. 83, Pl. Ex. 42), but does not state when she saw them and whether they were seen within the 300-day limitations period.  She also noted sexually offensive remarks made to her by male employees (Docket No. 82, Pl. Counterstatement ¶¶ 84-86; Docket No. 76, Def. Statement ¶¶ 84-86) again without stating when those remarks were made.

Plaintiff observed depictions of the Confederate flag on employee vehicles, t-shirts, and baseball caps, claiming that she saw them from 1996 (Docket No. 82, Pl. Statement ¶ 82; see also Docket No. 76, Def. Statement ¶ 95 (another African American female

26

employee also saw Confederate flags at the Lockport plant); cf. Docket No. 76, Def. Statement ¶ 82).

Thus, it is unclear whether some of these undated incidents (even otherwise continuous ones such as flying the Confederate flags) were timely for a Title VII claim. There are issues of fact when these undated incidents occurred relative to be timely for Plaintiff's present action.  Therefore, Defendant's motion for summary judgment (Docket No. 76) as to the timeliness of the undated claims is denied, see also McKenney v. New York City Off Track Betting, 903 F. Supp. 619, 621-22 (S.D.N.Y. 1995).

### 2.  Continuing Violations

The issue is whether Plaintiff's timely events are related to the prior events to deem the earlier events continuing conduct.  Plaintiff generally does not allege continuing conduct as to her personally.  The only items that may be deemed continuous are the offensive graffiti Plaintiff found during her annual inspections (again absent evidence of either when first depicted or detected and without statement that the graffiti was removed).  Inspections during the limitations period would make earlier inspection findings timely as continuing violation.

Plaintiff otherwise alleges episodic incidents that either involved her or were incidents she learned of from other African American or female employees.  Many of these incidents are undated in this record but some are alleged to have been continuing (such as one African American General Motors employee telling Plaintiff that he was called a "n___" every day at work, Docket No. 82, Pl. Counterstatement ¶ 92; see Docket No. 76, Def. Statement ¶¶ 90, 92, 94, 95; Docket No. 82, Pl. Counterstatement ¶ 88, at

27

73-74).   Plaintiff cites events of other employees with when they occurred.   Another African American employee found a second noose in 2014 (Docket No. 82, Pl. Counterstatement ¶ 88), within the 300-day Title VII period.  The singling out of the African American employee for viewing the 2015 NBA Finals during work hours (id. ¶ 96) also is timely as a continuing violation after the filing of the EEOC charge.

As a hostile work environment claim, these events are timely, Morgan, supra, 536 U.S. at 115-17.

C.  Title VII Claims

1.  Disparate Treatment

As for events forming timely claims, Defendant argues that Plaintiff did not establish that she suffered a materially adverse employment action or produce evidence of circumstances giving rise to inference of discrimination (Docket No. 76, Def. Memo. at 7-12).

Plaintiff responds that she suffered an adverse employment action of her delayed return to work following her disability leave, then being replaced in her position of safety supervisor, and her demotion when she finally returned (Docket No. 83, Pl. Memo. at 16-23).   She contends that there are no legitimate business reasons for the adverse employment action of demotion or at least raised material issue of fact regarding the validity of Defendant's purported reasons (id. at 21-22).

Defendant replies that Plaintiff has not shown a specific discriminatory policy but merely alleges "a string of allegedly discriminatory acts committed with one motive in mind" (Docket No. 89, Def. Reply Memo. at 3).

28

This Court considers only the timely individual incidents, that is those that occurred after December 2012.  As noted above, Plaintiff's earlier disparate treatment incidents are time barred.

a. <u>Prima Facie</u> Case, Direct Evidence of Discrimination

Plaintiff argues that she provided proof of direct evidence of Defendant's discrimination against her based upon the June 2013 statement of Michael Moresco admitting that all the disrespect Plaintiff endured was due to her being black and female in a workplace with little diversity (Docket No. 83, Pl. Memo. at 17; Docket No. 82, Pl. Counterstatement ¶ 40, at 26).  She concludes that the <u>McDonnell Douglas</u> burden shifting alternative is not required (Docket No. 83, Pl. Memo. at 17).

Moresco, however, was the human resources business partner who answered to the personnel director (<u>see</u> Docket No. 82, Pl. Counterstatement ¶ 15) and then said that Plaintiff should be patient and give his new boss, the personnel director, a chance (<u>id.</u> ¶ 40, at 26).  Moresco's job as well as the personnel director's above him are mid-level positions in Defendant (<u>see</u> Docket No. 76, Def. Statement ¶¶ 4, 17; Docket No. 82, Pl. Counterstatement ¶¶ 15, 40, Ex. 13, Def. organization chart, at Docket No. 84-14 at 3 of 244; Docket No. 76, Moresco Decl. ¶¶ 2-3).  Moresco's view as a non-decisionmaker cannot bind Defendant as its admission to be enough proof of discrimination (Docket No. 89, Def. Reply Memo. at 9), <u>see</u> <u>Muhleisen v. Wear Me Apparel LLC</u>, 644 F. Supp. 2d 375, 388 (S.D.N.Y. 2009).  Plaintiff has not alleged that Moresco had the authority to correct her complaints, <u>id.</u>  Also had a binding official for Defendant made this mere stray remark, this remark cannot by itself establish of direct evidence of discrimination, <u>Abdu-</u>

Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001) (id.). Plaintiff's argument of providing direct evidence **fails.**

>    b.   Prima Facie Case, Inference of Discrimination

Alternatively, Plaintiff argues that she established an inference of discrimination (Docket No. 83, Pl. Memo. at 18-21). Plaintiff is a member of two protected classes being African American and female; this is not contested by Defendant (see id. at 18). Defendant does not contest that Plaintiff was qualified for her position.

At issue here are whether Plaintiff suffered an adverse employment action and whether these circumstances give rise to the inference of discrimination. Reviewing the remaining timely incidents for both Plaintiff's race and gender discrimination claims, Plaintiff has not identified a tangible or cognizable adverse action that occurred from these episodes (Docket No. 76, Def. Memo. at 7-8). Plaintiff was upset after each incident and alleges that her medical leaves arose from her reaction to these incidents.

Plaintiff, however, needs to show that the materially adverse action was "a change in working conditions [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities," Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008) (id.). Aside from this disgust and upset, Plaintiff merely alleges work alterations arising from the circumstances of her return to work (and her attempts to do so in 2014). Prior to her September 2013 leave, Plaintiff does not allege alterations to her work responsibilities.

The delay in Plaintiff's permitted return to work after her medical leave in 2014 might be an adverse action. She required the additional clearance of General Motors psychiatrist Dr. Jones. Even accepting Plaintiff's contention that Dr. Jones delayed his

acceptance of her return for several months after she claimed fitness to do so, she did not establish an inference of discrimination. Plaintiff has not alleged that Dr. Jones' refusal to clear her was due to her gender or race. Plaintiff also has not claimed that Defendant induced Dr. Jones to delay his authorization.

Robert Duke applied for Plaintiff's former position in late January 2014 while Plaintiff was still on medical leave (Docket No. 82, Pl. Counterstatement ¶ 49, at 35). Defendant hired Duke on April 8, 2014, days after Plaintiff declared to Defendant her fitness to return to work (id.). Plaintiff applied for reinstatement after Duke was hired. The hiring of a white male to replace Plaintiff (an African American female) days before she declared her fitness to return does not raise a material issue of fact for the inference of discrimination. Hiring Duke to Plaintiff's former position predated her seeking to return to work. From Defendant's perspective, Plaintiff was on an indefinite leave and had been for over four months when it started the process to fill the vacancy so created by her leave.

Furthermore, when Plaintiff was rehired, she was brought to her previous level and at higher pay, even though her job title and responsibilities changed (see Docket No. 89, Def. Reply Memo. at 10). Whether this change in job title and responsibilities constitutes a demotion raises an issue of fact. That issue, however, is not material because Plaintiff did not claim a loss of salary or benefits after returning from her medical leave.

Thus, Defendant's Motion for Summary Judgment (Docket No. 76) to dismiss Plaintiff's disparate treatment Title VII claim (as alleged in her First and Fifth Causes of Action) is granted.

31

2.  Hostile Work Environment

Next, Defendant contends that Plaintiff's hostile work environment claims are without merit, since the conduct alleged was not severe or pervasive and Plaintiff has no evidence of harassing conduct based on race or gender (Docket No. 76, Def. Memo. at 12-20).  Defendant invokes Faragher-Ellerth defense, Faragher, supra, 524 U.S. at 788; Ellerth, supra, 524 U.S. 742, that discrimination laws do not create a code of civility in the workplace (id. at 13, 20-22).  Defendant claims it exercised reasonable care to prevent and correct any harassing behavior (by implementing its anti-harassment policy), but Plaintiff failed to take advantage of any preventative or corrective opportunities provided by Defendant to avoid harm (id. at 20-22), Faragher, supra, 524 U.S. at 807; Ellerth, supra, 524 U.S. at 765.  Plaintiff, for example, alleges various instances of sexual harassment and offending comments but she did not immediately complain about them after each incident (Docket No. 82, Pl. Counterstatement ¶¶ 84-87; Docket No. 76, Def. Statement ¶¶ 84-87; Docket No. 89, Def. Reply to Pl. Counterstatement to ¶¶ 84-87).

Plaintiff seeks this Court's consideration of all her allegations of discrimination, concluding that she established a prima facie case for hostile work environment (Docket No. 83, Pl. Memo. at 2-5).  She argues that there are issues of fact whether Defendant subjected Plaintiff to severe and pervasive race and gender-based intimidation and harassment and whether Defendant was vicariously liable for the hostile work environment perpetuated or allowed by its supervisors and employees (id. at 5-13, 13-16).  Defendant replies, however, that Plaintiff has not shown that the acts she alleges

are related in nature and severity to be the same hostile work environment practice (Docket No. 89, Def. Reply Memo. at 3).

Defendant enumerates 33 incidents Plaintiff claims constitute a hostile work environment (Docket No. 76, Def. Memo. at 14-15 (listing 23 incidents); Docket No. 89, Def. Reply Memo. at 5), then eliminates some as untimely (Docket No. 89, Def. Reply Memo. at 5-6, such as the 2004 racial slur; see Docket No. 76, Def. Memo. at 14 (allegations 1.-3.)).   Defendant considers other events race and gender-neutral (eliminating about one-third of the claims), and arguing other claims were not experienced by Plaintiff but by other employees or were never reported to Defendant (Docket No. 89, Def. Reply Memo. at 6).

Plaintiff "seeking to establish a Title VII hostile work environment claim must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive working environment,'" McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 79 (2d Cir. 2010) (quoting Harris, supra, 510 U.S. at 21).  Plaintiff here has alleged intimidation, ridicule, and insult (both to her and to other African American or female employees) in the graffiti, silhouettes, Confederate flags displayed in the Lockport plant, harassment, and the comments and epithets she heard and those heard by other African American or female employees.  The issue is whether these incidents collectively are sufficiently severe or pervasive to alter the conditions of Plaintiff's employment.  She alleges that they created sufficient distress that caused her to go on multiple medical leaves, leading to the loss of her position when she tried to return from the 2013 leave.

While other employees endured a steady barrage of racial insult and epithet, Plaintiff herself did not; she points to one time barred incident and incidents within the limitations period of using derogatory, but non-ethnic offending terms (calling her an idiot or refusing to provide her with needed data, depriving her of support staff, or giving her subordinate's work to perform in addition to her own duties). She also pointed to instances when she was ignored or faced disrespect from coworkers or subordinates. She complains of about four sexually disparaging comments addressed to her but which she failed to complain about to Defendant's management.

Looking at the totality of the circumstances—including the frequency of the discriminatory conduct, its severity, whether there was any physical threats or humiliation, whether her work performance was unreasonably interfered with, Harris, supra, 510 U.S. at 23—Plaintiff fails to establish a prima facie case for a hostile work environment. She does not claim that she was ever threatened. In some of the incidents, her work was impeded and interfered with (such as denied data or performing staff work assigned to others) but there she suffered no adverse consequences alleged for this interference save her stress claim. Plaintiff does not claim she was denied advancement or unreasonable delay in her projects from this conduct. While there are numerous instances cited by Plaintiff over a five-year span (from 2010 until filing EEOC Charges in 2014), they remain episodic, without events being connected by a common actor or repeated incident. While frequent, the incidents alleged are not severe, especially the incidents that occurred to Plaintiff directly.

34

A reasonable person would not find the environment at General Motors's Lockport plant was hostile or abusive to female or African American employees. Plaintiff only presents isolated incidents, not extremely serious either taken singly or collectively. These incidents do not suffice to state a hostile work environment claim. Therefore, Defendant's Motion for Summary Judgment (Docket No. 76) dismiss Plaintiff's hostile work environment claims based on sex (Third Cause of Action) and race (Seventh Cause of Action) is granted. As a result, this Court need not consider the Faragher-Ellerth defense, including Plaintiff's not complaining to Defendant's management about sexually offensive comments and acts (see Docket No. 82, Pl. Counterstatement ¶¶ 84-87; Docket No. 76, Def. Statement ¶¶ 84-87; Docket No. 89, Def. Reply to Pl. Counterstatement to ¶¶ 84-87).

### D. Retaliation

As for Plaintiff's Title VII and State Human Rights Law retaliation claims, Defendant argues that Plaintiff failed to state a claim since she did not suffer any materially adverse action motivated by retaliatory animus and she failed to show a causal connection between such adverse action and her actions (Docket No. 76, Def. Memo. at 22-25). Further, Defendant asserts that Plaintiff cannot rebut its non-retaliatory reasons for these actions (id. at 25).

Plaintiff counters that there is a causal connection between her Aware Line complaint in September 2013 and her terminated disability leave and demotion in December 2013 and her not being allowed to return to her former position for four months

after she filed her amended EEOC charge (Docket No. 83, Pl. Memo. at 25).  Plaintiff produced evidence that Defendant's rationale is pretext (id. at 26).

Plaintiff claims four protected activities that were subject to forms of retaliation. First, Plaintiff alleges that she was denied continued medical leave benefits from November 2013 (Docket No. 82, Pl. Counterstatement ¶ 49, at 34).  Second, she claims that Dr. Jones withheld authorization for Plaintiff to resume work from medical leave between April and October 2014.  Third, once she was rehired, she was placed on the less desirable second shift.  Fourth, in 2015, Plaintiff was not allowed to participate in an industrial hygiene training seminar that the safety representative would attend.

### 1.   Denial of Paid Medical Leave

As for the denied medical leave, Plaintiff claims that around one month on leave (after she filed her Aware Line complaint) Defendant terminated benefits (Docket No. 82, Pl. Counterstatement ¶ 49, at 34; Docket No. 82, Ex. 1, Pl. Decl. ¶ 39; Ex. B, Pl. Tr. at 308-09).

Defendant merely states this allegation in its Statement of Material Facts (Docket No. 76, Def. Statement ¶ 100).  In reply, Defendant generally characterized Plaintiff's Counterstatement response here (including discussion of loss of benefits) as "virtually incapable of response" that it "stretches out over eight pages and covers not only the handling of Rush's alleged behavior" (the subject of Defendant's ¶ 49) but also "Plaintiff's decision to take a leave of absence of nearly eight months and the hiring of another manager in the safety department" (Docket No. 89, Def. Reply to Pl. Counterstatement ¶ 49).  Defendant next argues that the "alleged temporary cessation of Plaintiff's disability

benefits is not actionable given that mere delays in receiving compensation do not establish an adverse employment action" (Docket No. 89, Def. Reply Memo. at 11). Defendant terms this a "de minimis personnel matter" that other courts have dismissed (id., quoting <u>Blake v. Potter</u>, No. 03 Civ. 7733 (LAP), 2007 WL 2815637, at *6 (S.D.N.Y. Sept. 25, 2007)).

Defendant knew of Plaintiff's medical leave.  Cutting off full or partial salary while an employee is on leave would be an adverse employment decision, the degree to which depends upon the duration Plaintiff was denied benefits.  Plaintiff argues a causal connection between her paid medical leave and her loss of leave benefits in her Counterstatement (Docket No. 82, Pl. Counterstatement ¶ 49, at 34).  There is a causal connection between the protected activity of receiving medical leave benefits and the cutting those benefits.  Animus can be inferred from the comment Plaintiff received a month after losing those benefits that it must have been tough to go without (Docket No. 82, Pl. Counterstatement ¶ 49, at 34).

As a result, Plaintiff alleges a <u>prima facie</u> case as to this claim.

### 2.  Dr. Jones and Timing of Plaintiff's Return from Medical Leave

Plaintiff went on this medical leave in September 2013 and applied for reinstatement in April 2014.  Meanwhile, in October 2013, she filed her EEOC and State Division of Human Rights Charges.

On April 6, 2014, Plaintiff learned of Defendant posting her job and hiring Robert Duke around April 28, 2014.  Plaintiff then applied for reinstatement from apparently unpaid leave and she met with Dr. Jones for her reinstatement in May 5, 2014 (id. ¶ 49,

at 36).  Plaintiff's claim is this hiring was in retaliation for her pending EEOC charges (see Docket No. 76, Def. Statement ¶¶ 53-54).

As for Dr. Jones' delay in approving Plaintiff's return to work, Plaintiff raises material issues of fact as to her retaliation claim.  Plaintiff claims retaliation in Defendant's Dr. Jones delaying her to return to work from April to October 2014 and, once she was reinstated from medical leave, placement into an available lesser safety representative position on the second shift.  Dr. Jones in his April interview with Plaintiff focused on her pending EEOC Charge, concluding that Plaintiff was not fit to return until she worked on her conflict resolution skills (Docket No. 82, Pl. Counterstatement ¶ 49, at 37, ¶ 101).  The psychiatric relevance of her EEOC proceeding is questionable.  She noted that review by Defendant's psychiatrist was novel, that for return after her 2010 leave (for stress and fatigue) she only needed to see her own doctor and Defendant's physician (id. ¶ 49, at 38, see also id. ¶ 109).  Her 2014 return from medical leave for stress due to the alleged hostile work environment required the additional approval from Dr. Jones.  The only differences between the two returns from leave are the requirement of psychiatric evaluation and that Plaintiff's latter return was while EEOC charges (those that led to this case) were pending.

The sequence of events stated herein is suspect.  Just as Plaintiff attempts to return to her position (a protected activity), a doctor (one not used before to evaluate Plaintiff's stress-induced medical leave) intervenes to delay her return while her job is filled by a white male.  Plaintiff then was placed in a different, non-supervisory position and denied meetings with other safety supervisors (Docket No. 76, Def. Statement ¶ 107).

The employment decisions here are (a) the additional psychiatric evaluation not otherwise required for reinstatement and (b) the hiring of Duke as Plaintiff's replacement while she was on medical leave.  There are questions as to Defendant's motivations in the timing of finding a replacement for Plaintiff and in requiring psychiatric screening for her return, and whether there is a causal connection between filling Plaintiff's position and her evaluation.

Substantively there is an apparent causal connection between Plaintiff seeking reinstatement and the delay due to Dr. Jones' refusal.  Although Dr. Jones has no explicit animus toward Plaintiff and later gave authorization for her return to work, Dr. Jones did refer in his evaluation to Plaintiff's pending EEOC Charge and used it (and his belief that she needed to work on her conflict resolution skills) to delay her reinstatement.  From the doctor's awareness of the discrimination proceeding and the timing of events (that Plaintiff sought reinstatement for a position already filled by Defendant), a jury could infer retaliatory intent in delaying Plaintiff's reinstatement.

Defendant argues to the contrary (Docket No. 89, Def. Reply Memo. at 11-12, citing Hudson, supra, 2008 WL 819687, at *10).  Factually, Hudson, was distinguishable; there, there was a nine-year gap between the protected activity and the delay in that plaintiff's return to work.  Here, the delay between Plaintiff seeking reinstatement and being reinstated was over five months, seeking her reinstatement on April 24, 2014, and being reinstated in October 2014 (Docket No. 82, Pl. Counterstatement ¶¶ 58, 101; see Docket No. 76, Def. Statement ¶¶ 58, 103) after speaking with Dr. Jones in September 2014 (Docket No. 76, Def. Statement ¶ 103).

This Court, in <u>Harenton Hotel, Inc. v. Village of Warsaw</u>, No. 12CV235, 2017 WL 4169342, at *7 (W.D.N.Y. Sept. 20, 2017) (Skretny, J.), found that three months was a reasonable amount of time between a protected action and an adverse decision to remain actionable as retaliation in a case alleging a multi-year delay, <u>see</u> <u>Housel v. Rochester Inst. of Tech.</u>, 6 F. Supp. 3d 294, 308 (W.D.N.Y. 2014) (Geraci, J.) (citing cases, for example, <u>Clark Cnty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001), dismissing retaliation claims where the adverse action occurred three to four months after the protected activity) (Docket No. 89, Def. Reply Memo. at 12). In <u>Housel</u>, that plaintiff alleged retaliation for her requests for reasonable accommodations under the Americans with Disabilities Act between 2003 and 2008, with some request were made at least six months prior to the termination of her contract and others made several years later, 6 F. Supp. 3d at 308.  While recognizing that the Second Circuit has not set a bright-line defining the outer limits for the time of a causal connection, in <u>Gorzynski v. Jet Blue Airways Corp.</u>, 596 F.3d 93, 110 (2d Cir. 2010), this Court recognized a causal connection can exist up to five months between relevant events, <u>Housel</u>, <u>supra</u>, 6 F. Supp. 3d at 308.  Applying these standards and taking the shortest period of six months between events, this Court in <u>Housel</u> found that the plaintiff there had not established temporal proximity to support an inference of a causal nexus, <u>id.</u>

The four months between Plaintiff filing her amended EEOC Charge and Dr. Jones' denied authorization is at the outer limit of what would be deemed a reasonable causal connection between those two events.  Coupled with Plaintiff not alleging any personal animus on Dr. Jones' part (<u>cf.</u> Docket No. 89, Def. Reply Memo. at 10), Plaintiff

fails to make a causal connection that a fact finder could infer retaliatory intent.  Therefore, she thus fails to allege a <u>prima facie</u> case for this claim.  Defendant's motion for summary judgment dismissing the claim arising from Dr. Jones' role in Plaintiff's readmission is granted.

### 3.  Assignment to Second Shift

Plaintiff claims she lost her old position and was assigned a second shift job as a safety representative, a demotion from her former position.  Defendant argues that Plaintiff was assigned that shift because of her preference to work in labor relations (Docket No. 76, Def. Statement ¶ 61; Docket No. 76, Def. Memo. at 24; Docket No. 89, Def. Reply to Pl. Counterstatement ¶¶ 53-63, at 6).  Plaintiff disagrees, stating that she was told by Defendant's personnel director that the only position available in September 2014 was on the second shift (Docket No. 82, Pl. Counterstatement ¶ 61).  Plaintiff also denies being rehired as a labor relations manager (<u>id.</u>, at 53-54).  Both parties agree that Plaintiff's second shift assignment was temporary, that upon her complaints about the assignment, Defendant reassigned Plaintiff.  Defendant also points out that Plaintiff remained designated at a higher level and received higher level of compensation (Docket No. 89, Def. Reply to Pl. Counterstatement ¶¶ 53-63, at 5-6).

Ordinarily, the reassignment to a different shift alone is not an adverse action, <u>Pacheco v. New York Presbyterian Hosp.</u>, 593 F. Supp. 2d 599, 618-19, 627 (S.D.N.Y. 2009) (citing cases, denying retaliation claim), while assignment to a different, lesser position is an adverse action, <u>see</u> <u>Williams v. Alliance Nat'l Inc.</u>, 24 F. App'x 50 (2d Cir. 2001) (summary Order) (Docket No. 83, Pl. Memo. at 24) (demotion as adverse action).

Here, this reassignment was temporary, for a few weeks.  At Plaintiff's request, she was reassigned to the first shift.  Therefore, she fails to allege suffering an adverse employment action from a brief assignment to a less desirable shift.

Defendant's willingness to change Plaintiff's assigned shift also belies any animus to support her argument of a causal connection between Plaintiff's activity (assignment back to a first shift position) and Defendant's action (reassignment to second shift).  It is not credible that Defendant would retaliate against Plaintiff by reassigning her to a less desired shift only to reassign her back upon her request.

Therefore, Defendant's motion for summary judgment to dismiss this second shift assignment claim is granted.

### 4.  Denial of Attendance at Training

As for denying permission for Plaintiff to attend the industrial hygiene training, Plaintiff fails to show that this was an adverse employment decision.  Denial of professional training may constitute an adverse employment action only "where the employee can show 'material harm' from the denial, 'such as a failure to promote or a loss of career advancement opportunities,'" Trachtenberg v Dep't of Educ. of City of N.Y., 937 F. Supp. 2d 460, 468 (S.D.N.Y. 2013) (quoting Hill v. Rayboy-Brauestein, 467 F. Supp. 2d 336, 351-52 (S.D.N.Y. 2006)); Zoulas v. New York City Dep't of Educ., 400 F. Supp. 3d 25, 55 (S.D.N.Y. 2019).  This Court, in Koss v. Strippit, Inc., No. 12CV486, 2016 WL 3963204, at *3-4 (W.D.N.Y. July 22, 2016) (Vilardo, J.), found that Ms. Koss failed to show that lack of professional training created a loss of career advancement opportunities where her proposed training was not related to her job

description.  Koss's employment did not change in any way as a result of losing the training opportunity, id. at *4.

In this case, Plaintiff fails to allege that this training was essential for her position (either her former one as safety supervisor or as a safety representative).  Although she notes that her positions were under the purview of global safety and industrial hygiene covered by that training (Docket No. 82, Pl. Counterstatement ¶ 106), she fails to articulate how missing one potentially relevant training would hinder her career, especially not noting her prior or subsequent on-the-job training or the training required to keep up to date in her field.  Unlike the return from leave, Plaintiff has not shown how she was disadvantaged by not being allowed to attend that conference.  Therefore, so much of Defendant's Motion for Summary Judgment dismissing this particular claim is granted.

5.  Effect of Issues of Fact for Prima Facie Case

Once Plaintiff meets the minimal burden of establishing a prima facie case of retaliation for the termination of medical leave benefits, St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); Giscombe v. New York City Dep't of Educ., 39 F. Supp. 3d 396, 400 (S.D.N.Y. 2014), the burden shifts under McDonnell Douglas to Defendant to establish its legitimate, nondiscriminatory reason for terminating her medical leave benefits.

Defendant, however, does not address Plaintiff's medical leave benefits being terminated or presented any reason for denial of those benefits (Docket No. 83, Pl. Memo. at 26).  Instead, Defendant contends that any disruption in those benefits was "temporary" or "de minimis" (Docket No. 89, Def. Reply Memo. at 11).  What is not clear from this

43

record is how long Plaintiff was deprived of benefits, whether this deprivation was in fact temporary or "de minimis" as Defendant terms it.  Defendant did not produce the amount of Plaintiff's benefits and confirm when they were terminated.  This record does not establish Plaintiff had a delay in receiving a salary, cf. Jones v. New York City Bd. of Educ., No. 09 Civ. 4815 (RWS), 2012 WL 1116906, at *14 (S.D.N.Y. Apr. 2, 2012), or its amount or extent to determine whether the loss was truly de minimis, cf. Blake, supra, 2007 WL 2815637, at *6, all cited by Defendant (id.).  Defendant argues that there was a mere delay in providing these benefits but produces no evidence of any delay or of Plaintiff's eventual payment.  Thus, it unclear whether Plaintiff's payment was delayed or made at all.

Therefore, Defendant's Motion for Summary Judgment (Docket No. 76) against her claims for retaliation based upon terminating Plaintiff's medical leave benefits (the Ninth Cause of Action) is denied.  As for the entirety of this Ninth Cause of Action for various forms of retaliation, Defendant's Motion is granted in part, denied in part, with denial only for the termination of her medical leave benefits and granting for the other retaliatory claims.

### E.  Remaining Claims

#### 1.  42 U.S.C. § 1981

Plaintiff alleges race discrimination in contracting under 42 U.S.C. § 1981.  The key difference between § 1981 and Title VII is the statute of limitations.  Thus, race-based disparate treatment incidents time-barred under Title VII may not be time-barred under § 1981 as impairing Plaintiff's right to contract for her employment (or New York State

Human Rights Law).  Plaintiff thus can assert race discrimination incidents from November 14, 2010, including (for example) George Miller's non-cooperation in 2012-13 that is time-barred as a Title VII disparate treatment claim but excluding such incidents untimely incidents as the withheld air sampling data in April 2010.  Substantively, the elements for both Title VII and § 1981 are the same for alleged racial discrimination in employment contracts.

Despite consideration of these earlier incidents, Plaintiff still fails to allege a claim under § 1981 for the same reasons for denial of her claims under Title VII for the later incidents.  While she alleges being a member of a racial minority and her employment with Defendant, Plaintiff fails to establish any adverse employment actions from these events (those considered with the timely Title VII claims and those under § 1981).  Even adding the 2010-13 incidents (those time barred if Title VII claims), Plaintiff also fails under § 1981 to establish an inference of discrimination.

Again, Moresco's June 2013 statement that all that was happening to Plaintiff was due (in part) to being African American does not constitute an admission by Defendant to prove direct evidence of discrimination under § 1981.  Similarly, where Plaintiff's hostile work environment failed under Title VII it also fails under § 1981.  Therefore, Defendant's Motion for Summary Judgment (Docket No. 76) dismissing the Eleventh Cause of Action under 42 U.S.C. § 1981 is granted.

2.  New York State Human Rights Law

Plaintiff alleges parallel New York State Human Rights claims (Second, Fourth, Sixth, Eighth, and Tenth Causes of Action) and, for her race discrimination claims, a

cause of action for interference with her employment contract due to her race under 42 U.S.C. § 1981 (Eleventh Cause of Action).  As with the § 1981 claims, the New York State Human Rights Law claims have similar elements as a Title VII claim but longer limitations period than the Title VII claims.  Plaintiff can assert these parallel state law claims arising from January 20, 2011, with the statute of limitations and tolling to issuance of the Right to Sue Letter.

Even with this extended time period for claims and incidents, Plaintiff has not alleged violation of New York Human Rights Law on the same grounds she failed to allege a federal civil rights violation.

Thus, the intersecting claims for race discrimination in Plaintiff's employment contract prior to November 14, 2010, are time barred for the two federal anti-discrimination statutes and the New York State Human Rights Law and Defendant's Motion for Summary Judgment (Docket No. 76) against these untimely claims is granted.

Since the analysis under the Human Rights Law is identical to Title VII analysis, the results stated above for Plaintiff's First, Third, Fifth, and Seventh Causes of Action apply to Plaintiff's State Human Rights Law Causes of Action (the Second, Fourth, Sixth, and Eighth Causes of Action) including earlier instances cited by Plaintiff.  The same results for Plaintiff's federal retaliation Ninth Cause of Action apply to her state law Tenth Cause of Action, denying dismissal of the Tenth Cause of Action for retaliation under the New York State Human Rights Law only as to Plaintiff's retaliation claim for terminated medical leave benefits but granting the motion for the other retaliatory allegations in the

Tenth Cause of Action.  Thus, Defendant's Motion for Summary Judgment (id.) as to the parallel state law claims are granted in part, denied in part.

## IV.    Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment (Docket No. 76) is granted in part, denied in part.  Defendant's motion to dismiss the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Eleventh Causes of Action is granted. Many of Plaintiff's allegations are time barred under the relevant statutes of limitations. The remaining timely claims failed to state a prima facie case for disparate treatment or hostile work environment.

Summary judgment is denied, however, against portions of Plaintiff's retaliation claims under Title VII and New York Human Rights Law (the Ninth and Tenth Causes of Action) for deprivation of disability benefits in 2013-14; dismissal of the other retaliation claims is granted.  Her retaliation claims for delayed restoration of her job while on medical leave in the spring of 2014 failed because she did not allege a causal connection to state a prima facie case.  Plaintiff also failed to establish Defendant's animus in that delayed restoration and for reassigning her to a second shift.  Plaintiff failed to show harm from the denial of a training session.

What remains for determination is so much of the Ninth and Tenth Causes of Action where Plaintiff alleges federal and State Human Rights Law retaliation claims for loss of medical leave disability benefits.

This Court will schedule a status conference (either before this Court or request the Magistrate Judge conduct it) in a later date to see what is necessary to ready the remaining claims for trial or for other resolution.

### V.    Orders

IT HEREBY IS ORDERED, that Defendant's Motion for Summary Judgment (Docket No. 76) is **granted in part, denied in part**.

SO ORDERED.

Dated:          November 20, 2020
                Buffalo, New York


                                                s/William M. Skretny
                                               WILLIAM M. SKRETNY
                                             United States District Judge

48